## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCHES OF:  )
The property located at    )
3448 Woodspring Drive     )
Lexington, Kentucky 40515;    )
                )
The person of Kayla Cronin; and   )
                )
Apple iPhone 12 with the Phone number  )
(859) 551-8402 and      )
IMEI of 350342021025640.    )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, J. Brian Burnett, being duly sworn, depose and state the following:

## INTRODUCTION

1.      I am a Senior Special Agent with the Department of Justice ("DOJ"), Office of the

Inspector General ("OIG"), and have been since August 2009.  As a Senior Special Agent of the

DOJ, OIG, I am authorized to investigate violations of law of the United States, and as a law

enforcement officer I am authorized to execute warrants issued under the authority of the United

States.  I have received training and gained experience in a variety of criminal laws and procedures

involving federal inmates in the custody of the Attorney General of the United States including

but not limited to: (1) criminal activity dealing with the introduction, possession, and concealment

of contraband; and (2) other prohibited activity associated with and the Federal Bureau of Prisons

("BOP"), as well as the facilitation of such activity by family members, correctional officers, staff

employees, and other persons who oversee or interact with federal inmates through communication

or direct contact.  Prior to my appointment as a Senior Special Agent with the DOJ, OIG, I was

employed as a United States Postal Inspector with the United States Postal Inspection Service for

five years.  I was responsible for conducting investigations involving the use of the United States mails to commit mail fraud, identity theft, and illicit narcotic crimes.

2.      As part of my duties as a Senior Special Agent with the DOJ, OIG, I investigate criminal violations that involve DOJ agencies, its employees, contractors, and persons in custody of the Attorney General, to include whoever provides to an inmate of a prison a prohibited object, or attempts to do so, in violation of Title 18, United States Code Section 1791(a)(1); or inmates who possess or obtain prohibited objects in prison, in violation of Title 18, United States Code Section 1791(a)(2); or conspiracies to commit the same, in violation of Title 18, United States Code Section 371.

3.      This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3448 Woodspring Drive, Lexington, Kentucky 40515 and Apple iPhone 12 with the phone number (859) 551-8402 and International Mobile Equipment Identifier (IMEI) of 350342021025640 (hereinafter "PREMISES" and "TARGET CELL PHONE," respectively).  The PREMISES and TARGET CELL PHONE are more fully described in Attachment A, herein incorporated by reference.  The items to be searched for and seized are described more particularly in Attachment B, herein incorporated by reference.

4.      The facts set forth in this affidavit are based upon my training and experience, my personal knowledge of this investigation, and my review of records, documentation, and information provided to me from others, including email correspondence, financial and business records, and in-person interviews.

5.      Since this affidavit is being submitted for the limited purpose of securing a search warrant, the information within is limited in scope to information relevant to this purpose, and I have not included every fact known to me or others concerning this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. In addition, all dates and times referenced throughout the affidavit are approximate. Finally, this affidavit references recorded phone calls reviewed by your Affiant. Quotations of the recorded phone calls included below reflect your Affiant's understanding of those recordings to the best of my training and knowledge. At times, such conversations are related in sum and substance.

6.      The information provided below is only the information necessary to establish probable cause, not necessarily all information known to law enforcement.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the PREMISES and TARGET CELL PHONE, identified in Attachment A, contains evidence of a violations of 18 U.S.C. §§ 1791(a)(1), (2) (providing or possessing contraband in prison) and 371 (conspiracy) (hereafter, "Subject Offenses").

## PROBABLE CAUSE

8.      The United States through the DOJ, OIG, is conducting a criminal investigation into a contraband conspiracy scheme at a BOP facility. Based on information received during that investigation, your Affiant believes that a Correctional Officer ("CO") at the Federal Correctional Complex ("FCC") Petersburg in the Eastern District of Virginia, is conspiring with FCC Petersburg inmates and associates to facilitate the introduction of contraband into FCC Petersburg, in violation of Title 18 U.S.C. § 1791(a)(1), (2). The FCC Petersburg CO received payments from the associate of an FCC Petersburg inmate in exchange for introducing the contraband. Your Affiant also believes that based on evidence obtained from BOP inmate records, interviews, and

3

subpoenas related to the aforementioned smuggling, evidence of these crimes will be found in the PREMISES and the TARGET CELL PHONE.

*Subjects Involved in the Scheme*

9.      FCC Petersburg Correction Officer Daniel Thomas ("Thomas") has reportedly sold contraband, including tobacco and anabolic steroids, to at least one inmate at FCC Petersburg.

10.     FCC Petersburg inmate William Hall ("Hall"), Registration Number 21005-032, is believed to have purchased contraband from Thomas. As discussed below, Hall was assigned to a work detail led by Thomas within FCC Petersburg.

11.     Kayla Cronin ("Cronin") is believed to have facilitated Hall's purchase of contraband from Thomas by, among other acts, communicating with Thomas on Hall's behalf (and vice versa) as well as providing funds to Thomas on Hall's behalf as part of Hall's purchase of contraband from Thomas. The PREMISES is Cronin's primary residence, and the TARGET CELL PHONE belongs to Cronin.

*Providing or Possessing Contraband in Prison*

12.     As discussed further below, there is probable cause to believe that Thomas, Hall, and Cronin conspired to cause currency, tobacco, cigarettes, and anabolic steroids to be introduced into FCC Petersburg. Each of those items are "prohibited objects" within the meaning of 18 USC § 1791(a)(1), (2). *See* 18 USC § 1791(d)(1).

13.     Likewise, FCC Petersburg qualifies as a "prison" under 18 USC § 1791(a)(1), (2). *See* 18 USC § 1791(d)(4).

14.     Lastly, the introduction of prohibited objects into FCC Petersburg was done without the knowledge or consent of the warden or superintendent of FCC Petersburg. Accordingly, there

4

is probable cause to believe that such introduction of prohibited objects into FCC Petersburg was done "in violation of a . . . rule" within the meaning of 18 USC § 1791(a)(1). *See* 28 C.F.R. § 6.1 (prohibiting the introduction or attempted introduction of "anything whatsoever" into a federal prison "without the knowledge and consent of the warden or superintendent").

*Information from a Confidential Source at FCC Petersburg*

15.     On October 18, 2022, FCC Petersburg Special Investigative Services ("SIS") Technician W.W. interviewed a Confidential Source ("CS") inmate.  The full identity of the CS is known to investigators.  The CS stated that CO Thomas was introducing contraband into FCC Petersburg for inmate Hall.  The CS stated that Hall works on Thomas' work detail.  BOP records indicate that Hall arrived at FCC Petersburg on April 19, 2022 and has worked on Thomas' detail since June 29, 2022.

16.     The CS stated Thomas smuggled in two pounds of tobacco per week and, in exchange, Hall directed his girlfriend to send $2,000 in U.S. Currency to Thomas via United States Postal Service ("USPS") Priority mail.  Although the CS did not specifically identify Hall's girlfriend, your Affiant believes that such reference was to Cronin for reasons stated below.  The CS further stated that Thomas received two $2,000 payments, with the last known payment being October 13th or 14th of 2022.  SIS Technician W.W. reviewed Hall's BOP approved contact list, which included names, contact information, and relationship types for individuals whom BOP has approved the inmate to contact.  Hall's BOP approved contact list referenced Kayla Cronin as Hall's "friend" and lists her phone number as (859) 551-8402—the same phone number associated with the TARGET CELL PHONE—and an email address of kaylamariecronin@hotmail.com. Furthermore, BOP records indicated that Hall received $75 via Western Union from Cronin on August 24, 2022, and Cronin's address was listed as 3448 Woodspring Drive, Lexington, KY.  In

addition, your Affiant has reviewed a Kentucky identification card issued to Kayla Cronin on October 8, 2021, with an address of 3448 Woodspring Drive, Lexington, KY. Based in part on these facts, your Affiant understands that Hall and Cronin share a close personal relationship.

17.     The CS further stated that the next shipment of tobacco to be introduced was believed to be for either October 17, 2022 or October 21, 2022. Additionally, the CS stated that Thomas might introduce steroids with the week's tobacco introduction. Once the tobacco was received by Hall, the CS stated that Hall brought the tobacco back from his work detail to the inmate housing unit.

18.     The CS stated that Hall was on the list to be transferred to Federal Correctional Institution ("FCI") Fort Dix. As a result, the CS stated that Hall recruited another FCC Petersburg inmate to continue the contraband introduction scheme with CO Thomas after Hall's transfer.

*Business Records Establishing Attribution of Phones*

19.     On or about November 16, 2022, pursuant to an OIG subpoena served by your Affiant, AT&T provided records for cell phone number (804) 661-2087. Your Affiant identified the (804) 661-2087 phone number as belonging to Thomas based on his BOP personnel records. In addition, AT&T listed the subscriber as Daniel Thomas with a residence in Prince George, Virginia.

20.     On or about November 14, 2022, pursuant to an OIG subpoena served by your Affiant, Verizon provided records for the cell phone number (859) 551-8402, associated with the TARGET CELL PHONE. Verizon listed the contact name as Kayla Craig and the account name as Tina Craig. Your Affiant searched the investigative database CLEAR for Tina Craig and found Tina Craig listed as a possible first degree relative of Kayla Cronin. CLEAR is a considered a

reliable law enforcement database, and your Affiant has used CLEAR in past investigations and found it to be reliable.  The CLEAR database lists the name Kayla Craig with the alias Kayla Cronin.  For these and other reasons outlined below, your Affiant understands that the TARGET CELL PHONE belongs to Cronin.  Hereinafter, your Affiant refers to Cronin's phone, with phone number (859) 551-8402, as the TARGET CELL PHONE.

*Information From Recorded Jail Calls Between William Hall and Kayla Cronin*

21.     On September 25, 2022, at approximately 2:20 p.m., Hall called Cronin's phone on a recorded phone call from the BOP inmate telephone system ("TRUFONE").  Hall told Cronin that he was "waiting on my boss to come back to work so I can get doing normal work. He told me Friday though he's got at least two more weeks before they medically clear him to come back into the compound."  Hall added, "They cut his intestines out. So he had a temporary shit bag, but he's got to have that put back in before he can come on the compound."  Review of BOP certified Time and Attendance (T&A) Summaries for CO Thomas indicate that CO Thomas was Absent Without Leave ("AWOL") for a total of 268 hours between August 16, 2022, and October 6, 2022. Based on these facts, your Affiant believes that Hall was referring to Thomas being absent from FCC Petersburg during this time due to a medical procedure.

22.     On October 4, 2022, at approximately 3:15 p.m., Hall told Cronin on a TRUFONE call that "my boss has been in the hospital for the past two months" and "course he comes back Friday."  Your Affiant interprets these statements to convey that Thomas had been in the hospital for several weeks and planned to return to work at FCC Petersburg on Friday, October 7, 2022.

23.     Hall further stated on this same call that "the Landlord is in a tight situation and needs money."  Hall stated that "the shop's been empty for a couple of months now, you know what I mean, so it's like, you know, he has had no rent money period for two months" and "I told

7

him you know he gets back in town this weekend, well, you know, we're ready to pay rent immediately." Based on my training, experience, and understanding of the facts of this investigation, your Affiant believes that Hall's use of the term "the Landlord" to refer to Thomas and that Hall's statement "we're ready to pay rent immediately" refers to Hall's willingness to purchase contraband from Thomas. Your affiant further believes that references to the word "shop" and/or "bike deliveries" refer to the sale and delivery of contraband in the prison.

As indicated below, Hall and Cronin repeatedly referred to Thomas as "the Landlord" and to payments for contraband as "rent" money. Although coded, the statements understood in context do not suggest that Thomas served as a legitimate landlord for Hall or Cronin. Rather, your Affiant believes that Hall and Cronin used the coded language in an attempt to conceal the purchase of contraband from Thomas.

24.    On October 7, 2022, at approximately 3:50 p.m., Thomas made a phone call to Cronin using the TARGET CELL PHONE. The duration of the call was approximately one minute and forty-four seconds. On October 7, 2022, at approximately 5:49 p.m.—approximately two hours after the call between Cronin and Thomas—Hall asked Cronin in a TRUFONE call, "I guess you spoke to the Landlord?" Cronin asked for "a specific name" to send the "rent" to. Hall responded that the landlord was "not using his normal name." Hall directed Cronin to send $1000 to the landlord, send $1000 to his mother, and keep $200 for herself. Cronin then informed Hall that, "A different person contacted me about 10 minutes ago asking for my Cash App as well. I'm assuming that's from your sale?" to which Hall responded, "Yeah it's from the bike delivery." As the conversation continued, Hall told Cronin, "The rent is $1,000 for him for that week you know and basically, the shop gets half, the Landlord gets half you know what I mean and then the odd

number is the accounting fee, you know. So, he didn't give you the name to put the rent?" Hall proceeded to instruct Cronin to send the "rent" as cash in "one of those cardboard three day business priority mail things." The conversation progressed with Cronin telling Hall that the "rent" is paid weekly, discussing the timing of when she should expect payments.

25.     On October 10, 2022, at approximately 4:59 p.m., Hall told Cronin in a TRUFONE call that, "You'll get a call from ole boy in the morning and he'll give you that name. When he calls you just ask him if he wants it next day or just do the three-business priority." The same day, at approximately 7:54 a.m., Hall told Cronin in a TRUFONE call to "Keep an eye out for an odd number. Landlord should call you today and just tell him you'll next day the rent to him and just take the fees out of my money." The next day, on October 11, 2022, at approximately 10:33 a.m., Cronin received an incoming call from 804-733-7881, the main number for FCI Petersburg – Low and a number to which Thomas has access. Thereafter, between approximately 4:11 p.m. and 5:02 p.m., Cronin and Thomas exchanged 16 text messages.

26.     On October 13, 2022, at approximately 4:40 p.m., Hall told Cronin in a TRUFONE phone call that "You should be seeing 16 come through here shortly and then they'll be some more coming, umm, you're only going to send the Landlord two this month or this week." Hall went on to tell Cronin that he was notified of his transfer to Fort Dix. Upon learning of Hall's transfer, Hall further related that, "My boss flipped out. He went and talked to the CMC, the Warden, everybody. They were like we can't change it. It's Grand Prairie. He's like man I just back from surgery, he's the only ones that trained and knows how to do what we can do down there. And their like if we do it for him we have to so it for everybody." Hall then continued, "as far as our business as far as the bike shop goes, I'm trying to work something out where things don't change." In the same conversation, with respect to another delivery, Hall instructed Cronin to "send the

9

Landlord the tracking number and what not you know. But I'm trying to work it out were nothing changes. You know what I mean." Cronin responded with "Ok. And you said 25 going to him instead of 35?" Hall responded, "No 2," which Cronin acknowledges, "2 ok ok." Hall then stated, "Just 2 yeah and then the other 2 will go to me, you know."

27.     Thereafter, on October 17, 2022, from approximately 7:09 a.m. to 4:00 p.m., Cronin and Thomas exchanged 10 text messages, with one of the messages being a Multimedia Messaging Service ("MMS") Message.  MMS messages are used to send pictures, but can also be used to send audio, phone contacts, and video files.

28.     On October 17, 2022, at approximately 9:26 a.m., Hall told Cronin in a TRUFONE phone call that, "I told the shop, I sent an email out telling them to call you because you want to do Zelle, remember we talked about the 28 its going to be 32 instead. So keep an eye, I told the customers to call you first before they got the bikes off, so."

29.     On October 18, 2022, at approximately 4:21 p.m., in a TRUFONE phone call, Hall states that "I might have you hold some for me in limbo just in case I need some money when I get to where I going." Cronin responds, "Ok, you just let me know and if I just need to pull it out, put it in an envelope and stick it in my safe I can do that for you, sometimes that's better so it's not in my view and confusing me."

30.     On October 21, 2022, at approximately 3:12 p.m., Hall asked Cronin in a TRUFONE phone call, "was you able to get the Landlords out."  Cronin then told Hall that she would go to the post office in the morning.  Hall told Cronin, "Send the Landlord a text too telling him that will be going out in the morning."  Cronin responded, "Ok."

10

31.     Thereafter, on October 21, 2022, from approximately 3:13 p.m. to 5:38 p.m., Cronin and Thomas exchanged three text messages.

32.     On October 30, 2022, at approximately 6:54 p.m., Hall asked Cronin in a TRUFONE call, "Do me a favor. Send the Landlord a text message and let him know that we are still working on bikes from last week, that no new bikes to be dropped off this week."  Cronin responded, "Ok, I'm gonna do that right now while we're on the phone." Hall stated, "Just tell him, we're still working on bikes from last week, um won't be ugh, just say no new bikes this week, it's been a slow week. Cronin responded, "OK, ok sent."  Later in the conversation, Hall stated, "I can still keep this shop up and running, and then start a new shop, you know what I mean."  Additionally, Hall stated, "Because you know, for real for real, me getting Landlord, a shop Landlord that works with me the way the Landlords working with me now, that's very rare, you know.  That's like a once in a lifetime opportunity, you know."  On October 30, 2022, at approximately 6:56 p.m., Cronin texted Thomas.  They exchanged two more text messages at approximately 8:27 p.m.

33.     On November 6, 2022, at approximately 5:59 p.m., Hall told Cronin in a TRUFONE call to "Send the Landlord a message ok and just tell him, just say thumbs up."  On November 7, 2022, from approximately 6:45 a.m. to 6:52 a.m., Cronin and Thomas exchanged four text messages.

34.     On November 13, 2022, at approximately 2:26 p.m., Hall asked Cronin in a TRUFONE phone call to "Do me a favor today, ugh send the Landlord a thumbs up text message um for ahh you know for this week. Um next to that write the word Menthol."  Excerpts taken from the conversation continue as follows:

        Cronin – "Ok hold on. Let me"

Hall – "I can't repeat that word."

Cronin – "Menthol?"

Hall – "Yes Yes"

Cronin "Oh ok.  I thought you said repeat it and I was like ok."

Hall – "No I said I don't want to repeat that word."

Cronin – "Oh I'm so sorry."

Hall – "I got ya, I got ya.  You know what I'm getting at."

Cronin – "Yeah. Sorry.  I'll shut up."

. . .

Hall – "I think I'll be getting transferred next week, you know. Which will suck. I think the shop's got 2 bikes getting dropped off next week so we will try to communicate with that as much as we can between my transfer.  You know what I mean."

. . .

Hall – "Don't forget to send that text message."

Cronin – "I already sent it."

35.    Your Affiant understands that "menthol" refers to tobacco products.  On November 13, 2022, at 2:29 p.m., Cronin sent Thomas a text message.   They exchanged three more text messages between approximately 3:05 p.m. to 3:09 p.m.

36.    On November 15, 2022, at approximately 5:44 p.m., Hall told Cronin in a TRUFONE phone call that "You should see a deposit come in tonight or tomorrow night. Now the shop's only taking in one bike this week not two.  So ugh, that will just, when you send it to the

12

Landlord just gonna send, instead of sending the Landlord a 1,000 send him 1,500 and take that five out of my half, you know what I mean, that way I'll only get five this time.  Hall then told Cronin to "send the Landlord a text tonight, tell him the shop is going to need that measuring device.  The measuring tool. They've got a wrecked bike and they got to square up the frame." Cronin responded by telling Hall, "Done, sent it, taken care of.  I try to do it right when you ask so I don't get off the phone and get hit with ten thousand things and forget."  Hall stated, "Go ahead and send him 15 this time."

37.     On November 15, 2022, at 5:48 p.m., Cronin sent Thomas a text message.  From approximately 5:53 p.m. to 6:18 p.m. Cronin and Thomas exchanged two more texts.

38.     On November 17, 2022, Hall is transferred from FCC Petersburg to FCI Fort Dix.

39.     On November 20, 2022, from approximately 1:09 p.m. to 1:38 p.m., Cronin and Thomas exchanged five text messages.

40.     On November 20, 2022, at approximately 5:41 p.m., Hall asks Cronin in a TRUFONE phone call "Did the Landlord respond to ya."  Cronin responds, "Yeah, he said that was fine. "Hall asks, "he didn't say what the name of the vitamin was."  Cronin responds, "Oh yeah, he did, um I'll have to look at, continue to review, come on, come on, come on, holy fucking shit, hold on, oh here let me look real quick, um fuck hold on, Anadrol 50."  Hall responded, "OK cool."  Your Affiant understand that Anadrol 50 is an anabolic steroid.

41.     On November 27, 2022, at approximately 1:10 p.m., during a TRUFONE phone call, Cronin tells Hall, "I sent the Landlord a text and told him I've got both 500's coming and I said he's going to eat that other 1000 till this is taken care of.  I wanted to make sure you were paid."  Cronin adds, "I'll pull the Landlord out the bank in the morning and send it."  Hall responds, "Ok cool, just send him the 15 and I shouldn't need no more sent for a while."  Cronin says, "I've

got all of the transactions, I just don't have it all written out clearly, so I then have to go back and look through the transactions to update what I have written out."

42.    On December 16, 2022, at approximately 12:25 p.m., Hall told Cronin in a TRUFONE phone call, "You need to make sure the Landlord is still playing ball, cause he might not be, so go ahead and send him a message, maybe tonight and say hey, you know, trying to drop a bike off."  Cronin responded, "I will check with him tonight."  Hall added, "I know some things have come up, so he may be, you know, stand backing right now."  On December 16, 2022, from approximately 6:38 p.m. to 6:42 p.m., Cronin and Thomas exchanged eight text messages.

43.    On December 17, 2022, at approximately 10:56 a.m., Hall asks Cronin in a TRUFONE phone call "Did you send the Landlord a message" to which Cronin responds, "Oh yeah, he said we're still good."  Hall asks Cronin, "You actually spoke to him or texted him" and Cronin responded, "I texted him."  Cronin then read the text message between her and the Landlord to Hall, stating: "I know there has been some hold ups, just wanted to check in case we get anything else, or that we have anything else come in. And he said, yeah, we should be ok. And he said are you coming back? And I said that location I don't believe so. He said ok, was just checking, I wasn't at work today to check his stuff.  That's all he said.  I said no worries at all, we just wanted to make sure we were still good if any orders come through."

44.    Based on law enforcement surveillance of the PREMISES on April 13, 2023, the following vehicle was observed at the residence: a silver 2015 Nissan SUV, with Kentucky license plate BAW-046 registered to House to Home Inspectors, LLC.  Your Affiant searched the investigative database CLEAR for Kayla Cronin and found the PREMISES to be the most recently reported address.  Kentucky Wage and Employment History for Cronin indicates she has been

employed by House to Home Inspectors since March 2021.  As of May 2, 2023, the United States Postal Service advised that Cronin was the only recognized name to receive mail at the PREMISES.

45.     In your Affiant's training and experience, when people act in concert with another to commit a crime, they frequently utilize cell phones, computers, tablets, notebook computers, and like devices to communicate with each other through voice calls, text messages, social media accounts, and emails.  These devices as described in Attachment B, allow subjects to plan, coordinate, and execute criminal activity.  The examination of such data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device(s) in question.

46.     Based on the totality of facts and circumstances referenced herein, your Affiant believes it is probable Cronin and Hall are involved in making payments to an FCC Petersburg employee, namely Thomas, to facilitate a contraband conspiracy at FCC Petersburg.

47.     Your Affiant believes there is probable cause Cronin is in possession of items related to the introduction of contraband scheme into FCC Petersburg and those items are located at the PREMISES and on the TARGET CELL PHONE.  As such, your Affiant finds it necessary and prudent to search the PREMISES and TARGET CELL PHONE described in Attachment A for the items described in Attachment B.  The PREMISES, the residence of Cronin, and the TARGET CELL PHONE, are the physical locations Cronin likely stores items related to introduction of contraband scheme into FCC Petersburg, and evidence and fruits of the crime as described in Attachment B.

48.     In your Affiant's training and experience, parties responsible for criminal activity often hide evidence in locations that they frequent and in which they have comfort.  As such, the

PREMISES and TARGET CELL PHONE would be an ideal location for Cronin to store items of evidentiary value related to the contraband scheme.

<u>**Technical Terms**</u>

49.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen.  Like wireless phones, tablets

function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

i.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

j.      A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire

19

or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the

user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      n.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.   This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the

name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

o.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

p.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

**Computers, Electronic/Magnetic Storage, and Forensic Analysis**

50.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found at the places to be searched, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers;

personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found in the places to be searched, there is probable cause to believe that the items described in the attachments will be stored in any discovered digital device for at least the following reasons:

   b.   Individuals who engage in criminal activity use digital devices to communicate with co-conspirators, to store documents, pictures, videos, and other files relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; and contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

   c.   Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

d.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

51.      As further described in the attachments, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the device(s) at issue here because:

        a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user

of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      b.   Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.   A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

### Methods To Be Used To Search Digital Devices

52.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often-requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital

27

devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

       c.   Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

       d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.

Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are

often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

53.    The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Therefore, in searching for information, records, or evidence, further described in the attachments, law enforcement personnel executing this search warrant will employ the following procedures:

      a.    Upon securing the places to be searched, law enforcement personnel may, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in the attachments and transport these items to an

appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the places to be searched.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in the attachments.

> b.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

> c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in the attachments.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in the attachments. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## Unlocking Electronic Devices using Biometric Features

54.     This This warrant permits law enforcement to compel any person(s), including CRONIN and any residents or overnight guests for whom there is reasonable suspicion to believe have committed a criminal violation that is the subject matter of this search warrant, and who may have had ownership, custody or control over electronic devices found within the PREMISES, to provide biometric access to unlock any devices subject to seizure pursuant to this warrant. Examples of devices for which there is reasonable suspicion that CRONIN's, residents' or any overnight guests' biometrics will unlock the devices are those electronic devices located on such person, in near proximity to them (such as in the nightstand in their bedroom, or located on a kitchen or dining table near that person while that person is eating a meal), or in a place that is reasonably associated with such person at the time of the execution of the requested search warrant. The grounds for this request are as follows:

      a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

      b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can

unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.       If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.       If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.       In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.       As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices may be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.       I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four

hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any person against whom there is reasonable suspicion to believe they committed a criminal violation and had ownership, custody or control of the devices to the fingerprint scanner of the devices found at the PREMISES; (2) hold the devices found at the PREMISES in front of the face of any person against whom there is reasonable suspicion to believe that they committed a criminal violation and had ownership, custody or control of the device found at the PREMISES and activate the facial recognition feature; and/or (3) hold the devices found at the PREMISES in front of the face of any person against whom there is reasonable suspicion to believe they committed a criminal violation and had ownership, custody or control of the device found at the PREMISES and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.  The proposed warrant does not authorize law enforcement to compel that any individual at the PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the devices.  Moreover, the proposed warrant does not authorize law enforcement to compel any individual at the PREMISES to identify the

specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION**

55.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of such criminal offenses may be located at the PREMISES and on the TARGET CELL PHONE described in Attachment A.

56.    I, therefore, respectfully request that attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.


Respectfully submitted,


/s/ J. Brian Burnett
J. Brian Burnett
Special Agent
Department of Justice
Office of the Inspector General


Transmitted via email and attested to by telephone in accordance with Fed. R. Crim. P. 4.1 on this 13th day of June, 2023.


HON. MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE